# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1036

CLYDE AMMONS,

*Plaintiff-Appellant,*

v.

ARAMARK UNIFORM SERVICES, INC.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 4073—**John W. Darrah**, *Judge.*

———————

ARGUED DECEMBER 5, 2003—DECIDED MAY 21, 2004

———————

Before FLAUM, *Chief Judge,* and MANION and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Clyde Ammons sued his former employer, Aramark Uniform Services, Inc. ("Aramark"), for terminating his employment in violation of the Americans with the Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (the "ADA"). At the close of discovery the District Court for the Northern District of Illinois (Eastern Division) granted summary judgment in favor of Aramark. Ammons appeals from

that decision. He also challenges the district court's decision to strike testimony offered by Ammons' expert as well as several of Ammons' responses to Aramark's statement of undisputed facts in support of its motion for summary judgment. We affirm.

## I.

Aramark (or its predecessor) employed Ammons for almost forty years. Most recently, Ammons was employed at Aramark's Chicago, Illinois, laundry facility as a boiler engineer and lead mechanic. On August 15, 1997, Ammons injured his right knee on the job. Following the injury, he sought treatment from Dr. Mitchell Krieger, an orthopedic surgeon who, in October 1997, performed surgery on Ammons' knee.

Ammons returned to work on November 17, 1997. Ammons was assigned to light duty and was restricted in the amount of climbing he could do, the amount of time he could spend on his knees, bending, squatting, climbing stairs, lifting, and use of a ladder. Despite his light duty assignment, Ammons voluntarily withdrew from work less than a month later and took a medical leave of absence.

On February 14, 1998, Ammons again returned to work in a light duty capacity. Approximately one month later, Ammons voluntarily took a second leave of absence. After that, Ammons did not return to work at Aramark.

On April 9, 1998, based on a functional capacity evaluation, Dr. Krieger concluded that Ammons had reached the point of maximum medical improvement, i.e., Ammons' condition was permanent. Dr. Krieger also concluded that Ammons could not return to his normal duties at Aramark and that he was limited to a light-medium level of work

with the following restrictions: minimal kneeling (no longer than five minutes at a time); a limited period of "static standing" (no longer than eight minutes at a time); a maximum of one hour of "dynamic standing"; limited climbing; and restricted walking on a "pain-level basis." Dr. Krieger also concluded that Ammons could not resume a heavy level of work activity. Such a level would include occasional lifting of 100 pounds, frequent lifting of 35 pounds or less, and constant lifting of 15 pounds.

In September 1998, in conjunction with a worker's compensation claim for the same injury, Ammons met with Susan Entenberg, a vocational rehabilitation counselor. After meeting with Ammons and reviewing his job responsibilities and medical records, Entenberg concluded in a report dated October 6, 1998 that Ammons' work at Aramark required heavy exertion and that Dr. Krieger's restrictions amounted to a "sedentary restriction." Entenberg also concluded that Ammons was not capable of returning to his position as it was generally performed but also recommended that Aramark could make accommodations for Ammons' condition.

In January 1999, Ammons, who was still on medical leave, asked to return to work. To explore this possibility, Jeff Schwingler, the general manager of the Chicago plant, and Barrington McPherson, a co-worker of Ammons and a union steward, met with Ammons on January 21, 1999, to discuss possible accommodations that might permit Ammons to return to work. Neither Ammons' attorney nor Entenberg were present at this meeting. At the meeting, Schwingler asked Ammons to identify specific tasks he was capable of performing. Ammons stated that he could operate the plant's boiler with some assistance, repair the plant's sewing machines, and provide general troubleshooting assistance. In the weeks following the meeting,

Schwingler discussed Ammons' case with Alexander Ur, Aramark's Director of Employment Practices, and the Chicago facility's maintenance manager Pasquale Malfeo.

In a letter to Ammons dated March 9, 1999,[1] Ur rejected Ammons' request to return to work to perform the duties Ammons had set forth in his meeting with Schwingler and McPherson. In making this decision Ur relied on Entenberg's report, Dr. Krieger's assessment of Ammons' physical restrictions, and Ur's own discussions with Malfeo and Schwingler. Ur informed Ammons that the duties Ammons proposed were too limited given the amount of work he could not do, and thus did not amount to a reasonable accommodation of Ammons' condition. Although Ur saw no problem with allowing Ammons to have assistance in completing his boiler room duties, these duties took only 3.5 to 4 hours per day. There was little else that Ammons was capable of doing the remainder of his workday. Because Ammons could not perform the maintenance and repair duties that generally took up the rest of the

---

[1] There is some confusion in the pleadings, the briefs of the parties, and the opinion of the district court as to the timing of this letter and a second meeting on or after March 10, 1999 to discuss accommodations for Ammons. As best we can tell from the record, Ur sent his letter to Ammons on March 9, 1999. This letter had not been received by Ammons when he requested, in writing, on March 10, 1999, a second meeting with Schwingler to discuss returning to work. At this second meeting Ammons repeated the request he made in January, namely, that he be able to return to Aramark with responsibility for operating the boiler room, repairing and maintaining the sewing machines, and serving as a maintenance troubleshooter. Apparently, Schwingler either rejected Ammons' suggestions or told him he would take them under consideration. In any event, the confusion surrounding these events is immaterial.

workday, he would not, in Ur's view, be completing the essential functions of the job. Ur rejected Ammons' suggestion that Ammons could maintain and repair the plant's sewing machines. The plant had only a few sewing machines and these did not need repair frequently enough to require an employee dedicated to that task. Finally, Aramark had no need for a general troubleshooter. The company expected its maintenance staff to perform maintenance and repair functions; it did not need (and could not afford) an employee who could identify problems but could not actually repair equipment himself.

In late March 1999, Ammons met with Schwingler, other Aramark managers, and representatives of Ammons' union. At that meeting, Joe Dayton, Aramark's director of labor and employee relationships, informed Ammons that the collective bargaining agreement governing Ammons' employment stated that an employee would be terminated if he was absent due to illness or injury from work for more than 18 months. Aramark had placed Ammons on medical leave as of May 8, 1998, approximately two months after Ammons had last worked at Aramark in a light duty capacity. On November 8, 1999, 18 months after having been placed on medical leave, Ammons was terminated from his position with Aramark.

In June 2001, Ammons filed this lawsuit alleging that his termination by Aramark violated his rights under the ADA. The parties then engaged in a significant discovery process. As part of this discovery process, Ammons put forth Entenberg as a proposed expert witness. Although in her 1998 report Entenberg concluded that Ammons was not capable of returning to his past work, she has apparently since that time reached a different conclusion. After conducting a tour of the plant and interviewing Malfeo and

McPherson, Entenberg concluded in a report and deposition that Ammons could perform "the vast majority" of his job functions.[2]

At the close of discovery, both parties filed motions for summary judgment. Aramark argued that Ammons was not a qualified individual within the meaning of the ADA. Ammons argued that Aramark had not engaged in the interactive dialogue with Ammons necessary to satisfy Aramark's duty to explore whether a reasonable accommodation could be made for Ammons' disability.

Aramark also made two motions important here. First, Aramark moved to strike Entenberg's proposed expert testimony because, Aramark argued, it was unreliable and lacked proper foundation. Second, Aramark moved to strike approximately 100 of Ammons' responses to Aramark's proposed statement of undisputed facts submitted in conjunction with the cross-motions for summary judgment. Aramark argued that Ammons failed to comply with the Northern District of Illinois's local rule concerning the preparation of statements of undisputed facts.

The district court granted both motions. Specifically, the district court held that Entenberg's conclusion that Ammons was capable of performing the vast majority of his duties "is only unsupported speculation" and was thus unreliable. The district court also concluded that the 100 or so of Ammons' responses to Aramark's proposed statement of undisputed facts identified by Aramark should be stricken for violations of the district court's Local Rule 56.1.

The district court then granted summary judgment in favor of Aramark. The district court concluded that Ammons could not perform the essential functions of his job with or

---

[2] The facts surrounding Entenberg's report will be discussed in depth below.

without reasonable accommodations. The district court further held that Aramark had engaged in an interactive process as required by the ADA but that, even if it had not, the undisputed facts showed that there were no reasonable accommodations that would have allowed Ammons to complete the essential functions of his job. This appeal followed.

## II.

Ammons raises four issues on appeal. First, Ammons argues that the district court erred in striking Entenberg's testimony. Second, Ammons argues that his responses to Aramark's statement of uncontested facts substantially complied with the Northern District of Illinois rule concerning such responses and therefore the district court erred in striking them. Third, Ammons argues that the district court erred in granting summary judgment in favor of Aramark. Finally, Ammons argues that Aramark did not fulfill its duty to engage in an interactive process to determine whether reasonable accommodations were possible and thus, Ammons was entitled to summary judgment on that basis. We address each argument in turn.

### A.  Entenberg's Testimony

As we explained above, Entenberg concluded in October 1998 that Ammons was "not capable of returning to his past work." Entenberg based this conclusion on a review of Ammons' medical records and an interview with Ammons. Entenberg described the restrictions placed on Ammons as sedentary while his duties at Aramark required heavy exertion.

Entenberg was later retained by Ammons as an expert in this case. She concluded in a letter to Ammons' counsel

dated May 10, 2002, that "Ammons' restrictions did not preclude him from performing the majority of the work duties." Entenberg based her revised conclusion primarily on a tour of the Chicago facility and meetings she held with Malfeo and McPherson.[3] Entenberg did not interview Ammons a second time, nor did she review the deposition testimony of McPherson and Malfeo. During his deposition, Malfeo stated that Ammons could be expected to repair and maintain several pieces of machinery and equipment identified to him by Aramark's counsel.

Entenberg indicated in her deposition that the tour of the facility took approximately three hours, including the time she spoke with McPherson, and that she also spoke with Malfeo by phone for approximately an hour. Entenberg also admitted at this deposition that she did not observe any repairs being conducted while she toured the plant and that she did not see all of the equipment and machinery Ammons could be called on to maintain or repair. Entenberg was also asked whether she had any opinion as to whether Ammons could repair and maintain several specific pieces of equipment, including the equipment Malfeo had testified that Ammons was expected to repair and maintain. Entenberg admitted that she was not familiar with several pieces of equipment and could offer no opinion as to whether Ammons was capable of making the necessary repairs.

---

[3] Entenberg met with McPherson while on her tour of the Chicago plant and also spoke with him separately. At her deposition Entenberg stated that she remembered nothing of what she and McPherson discussed in their separate meeting. We treat as important, therefore, only her meeting with McPherson during the tour.

The district court, relying on the Supreme Court's seminal cases concerning the admission of expert testimony, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and this court's subsequent cases, held that Entenberg's proposed expert report—that Ammons could perform the vast majority of his duties—was not reliable. In so holding, the district court noted that "Entenberg admits that she did not observe any repairs being conducted while on the tour and that she did not observe all of the equipment and machinery that Ammons could be called on to maintain or repair." The district court also noted that Entenberg had failed to review Malfeo and McPherson's depositions and had not re-interviewed Ammons. The district court also held that Entenberg's report was speculative: "In light of her inability to form an opinion concerning [several pieces of equipment and machinery, Entenberg's] conclusion that Ammons could perform the 'vast majority' of his job functions is not based on any specific methodology applied to the facts but is only unsupported speculation."

This court's review of a district court's decision concerning expert witnesses has two parts. First, this court must determine "whether the district court properly followed the framework set forth in *Daubert*." *United States v. Brumley*, 217 F.3d 905, 911 (7th Cir. 2000). This framework requires the district court to determine whether (1) the proposed witness "would testify to valid scientific, technical, or other specialized knowledge and (2) his testimony will assist the trier of fact." *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 787-88 (7th Cir. 2000) (citing Fed. R. Evid. 702; *Kumho*, 526 U.S. at 147-149; *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000)). The first prong of this framework evaluates the reliability of the testimony. A court is expected to reject "any subjective belief or speculation." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citing *Porter*

*v. Whitehall Labs. Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)). The second prong evaluates the testimony's relevance. Whether a district court has properly followed the *Daubert* framework is subject to de novo review. *Brumley*, 217 F.3d at 911.

The district court in this case properly applied the *Daubert* framework: The district court identified the relevant analysis and focused its inquiry on whether Entenberg's testimony was reliable. Because the district court followed the *Daubert* framework, we must next "review the district court's decision to admit or exclude expert testimony *only* for an abuse of discretion." *Id.* (emphasis added).[4] In determining whether evidence is reliable, "the district judge must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 640 (7th Cir. 2003).

There is no question concerning Entenberg's qualifications. Nor is there any question that Entenberg's proposed testimony—that Ammons is capable of performing his job—would be relevant. The only question, therefore, is whether Entenberg's proposed testimony is reliable.

Like the district court, we conclude that Entenberg's testimony was speculative. Entenberg offered her opinion, that Ammons was capable of performing the vast majority

---

[4] Ammons is in error when he argues that we should review de novo the district court's decision that Entenberg's testimony was not reliable. As we explained above, we review de novo only whether the district court properly applied the framework of *Daubert. Brumley*, 217 F.3d at 911. We review a district court's actual determination that a proposed expert's testimony is unreliable (or for that matter, reliable) only for an abuse of discretion. *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Kumho*, 526 U.S. at 152.

of his job duties, while acknowledging that she could offer no opinion as to whether Ammons could repair several pieces of machinery earlier identified in a deposition of the plant's former maintenance manager as machinery Ammons would have to repair as part of his job. Not only had Entenberg not reviewed this deposition testimony, she acknowledged she was unfamiliar with the machinery and did not see them being repaired during her tour. Without being able to offer any opinion as to whether Ammons was capable of repairing these pieces of machinery, Entenberg's opinion was nothing more than speculation.

### B. Ammons' Responses to Aramark's Statement of Undisputed Facts

The second issue on appeal concerns the Northern District of Illinois Local Rule 56.1(a). This rule requires a party moving for summary judgment to include with that motion "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." N.D. Ill. R. 56.1(a). This statement must be organized by numbered paragraphs. *Id.* The party opposing the motion must respond to this statement of facts with:

> (A) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and

> (B) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

N. D. Ill. R. 56.1(b). The rule also provides that "[a]ll material facts set forth in the statement required of the moving

party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.*

Aramark moved to strike nearly half of Ammons' 200 responses to Aramark's statement of facts. The district court granted the motion, finding that Ammons' responses were defective for an assortment of reasons. First, the district court found that a large number (approximately 80) of Ammons' denials of factual statements by Aramark failed to cite facts supporting the denial or impermissibly added new, unrelated facts. Second, the district court found that four of Ammons' responses failed to cite any part of the record in support of the denial. Third, the district court found that two responses were improper because the responses cited an entire deposition transcript rather than specific page references. Finally, the district court determined that six of the responses were improper because Ammons failed to admit or deny Aramark's allegations.

This court reviews the decision of a district court concerning compliance with local rules, such as Rule 56.1, for an abuse of discretion. *Borcky v. Maytag Corp.*, 248 F.3d 691, 697 (7th Cir. 2001). We have also repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1. *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) ("Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (collecting cases). Thus, as an initial matter, Ammons' argument that the district court erred in striking his responses because he *substantially* complied with Rule 56.1 is inapt. Substantial compliance is not strict compliance.

Having reviewed the responses at issue, we do not believe the district court abused its discretion when it struck the

responses. Rule 56.1 envisions a separate statement of additional facts. In this case, several of Ammons' responses to Aramark's allegations admit to the allegation but then add other additional facts. These facts should have been included in a separate statement. They were not, and the district court did not abuse its discretion in striking the responses.

In addition, where a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial. Citations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate. A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity. *See Waldridge*, 24 F.3d at 922 ("[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions."); *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."). Two of Ammons' responses cited only to a 30-page exhibit and did not provide a specific page reference. Other responses simply denied an allegation and provided no citation whatsoever. The district court did not abuse its discretion in striking these responses.

Finally, several of Ammons' responses do not include a statement to the effect that Ammons agrees with or denies Aramark's allegations. Instead, for these responses Ammons merely states that the allegations are irrelevant. They may be. This does not excuse, however, the non-moving party from at least indicating that it agrees with or denies the allegation. The district court did not abuse its discretion in striking these responses.

*C. Aramark's Motion For Summary Judgment*

We next consider whether Aramark was entitled to summary judgment. Summary judgment is appropriate only where "there is no genuine issue as to any material fact." *Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 815 (7th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). We review a grant of summary judgment de novo and view all facts, and draw all reasonable inferences, in Ammons' favor.

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To determine whether a disabled person is qualified, this court considers whether he can perform the essential functions of his job at the time the employer makes the allegedly discriminatory employment decision. *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir. 1998).

Both parties agree that Ammons is disabled within the meaning of the ADA. The only question is whether Ammons could perform the essential functions of his job with or without reasonable accommodations. The factors to take into consideration when determining "whether a job duty constitutes an essential function include [the employee's] job description, [the] employer's opinion, [the] amount of time spent performing the function, [the] consequences for not requiring the individual to perform the duty, and past and current work experiences." *Emerson v. Northern States Power Co.*, 256 F.3d 506, 512-13 (7th Cir. 2001).

The undisputed facts in this case demonstrate that the essential functions of Ammons' job included the repair and maintenance of all the equipment and machinery in the plant. Approximately one-half of his day was typically spent tending to the plant's boiler. The other half of the day involved maintenance and repair. Although, of course, Ammons could not always predict what machinery and equipment he could be called on to repair on a given day, the job required heavy exertion and included frequent standing, climbing, walking, kneeling, and lifting in excess of 50 pounds three to five times a week.

Moreover, the plant's three boiler engineers worked on a staggered schedule and were responsible for covering a 20-hour day. Thus, there were times when an engineer would be the only person at the plant with the responsibility to repair machinery and equipment including machinery and equipment that, if inoperable, could shut down the entire plant. To reach these particularly crucial pieces of machinery, a maintenance engineer might find it necessary to climb and lift equipment that weighed as much as 50 to 100 pounds.

In light of Ammons' injuries and Dr. Krieger's subsequent restrictions, which, as indicated above, included limitations on standing, kneeling, walking, and climbing, we agree with the district court that Ammons was unable to perform the essential functions of his job without reasonable accommodations. The essential functions of Ammons' job included duties and exertion greatly exceeding the restrictions that Ammons' own physician placed on him.

Further, we do not believe that the duties Ammons suggests he could perform amount to reasonable accommodations. Ammons' suggested accommodations would amount to a significant change in the essential functions of his job. Although tending to the boiler with assistance and

repairing the plant's sewing machines are reasonable accommodations for Ammons' disability, these tasks would account for only approximately half of Ammons' workday. *Cf.*, *DeVito v. Chicago Park Dist.*, 270 F.3d 532, 534 (7th Cir. 2001) (accommodations for a full-time employee are expected to permit the employee to work full-time). The only other accommodation Ammons offered, serving as a maintenance troubleshooter, would amount to an entirely new position—one that Aramark did not previously maintain and had no plans on creating. It is not, therefore, an accommodation that would permit Ammons to perform the essential functions of his job; instead it would change the essential functions of his job. As we have previously held, "[a]n employer is not obligated to change the essential functions of a job to accommodate an employee." *Emerson*, 256 F.3d at 514; *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996) ("[A]n employer [is not] obligated to create a 'new' position for the disabled employee."). Therefore, Ammons could not perform the essential functions of his job even with reasonable accommodations. Accordingly, Aramark was entitled to summary judgment in its favor.

### D.   The Interactive Process

Ammons' final argument is that Aramark failed to engage in the required interactive process to discuss reasonable accommodations for his disability. *Emerson*, 256 F.3d at 515 ("[T]he ADA requires employers to engage in an interactive process with disabled employees needing accommodation so that together they can identify the employee's needs and discuss accommodation options."). Ammons' primary contention is that Aramark failed to agree to an interactive process because it did not consent to a meeting that included Ammons' counsel and Entenberg.

The duty to engage in an interactive process does not mandate a meeting with an employee's attorney and vocational counselor. Aramark satisfied its duty to discuss reasonable accommodations with Ammons through its face-to-face meeting with Ammons in January 1999. As recounted above, Ammons met on January 21, 1999, with Schwingler and McPherson (a co-worker and union steward). At this meeting Ammons was given an opportunity to set forth the duties he could perform. Ammons was also told to keep the company informed if he thought of other ways in which he could be accommodated. Following this meeting, Ur discussed, in more than one conversation, Ammons' request with Schwingler and Malfeo, who, as Ammons' supervisor, was knowledgeable of the duties Ammons could be called on to undertake. Ur also reviewed Entenberg's 1998 evaluation of Ammons. It was based on this evaluation, his conversations with Schwingler and Malfeo, and Ammons' own statements concerning what he could do, that Ur decided that there were no reasonable accommodations for Ammons. This satisfied Aramark's responsibility with respect to an interactive process.

We find no support, and Ammons has offered none, for the conclusion that an interactive process must include an employee's counsel or other persons including a rehabilitation counselor. Although there may be cases where an attorney or a vocational expert would be of considerable assistance in the interactive process, there is no requirement that an attorney and/or vocational expert need to participate. The ADA envisions no more than "a flexible, interactive process by which the employer and employee determine the appropriate reasonable accommodation." *Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000). Such an interactive process occurred here.

### III.

The district court did not err in striking Entenberg's testimony and Ammons' responses to Aramark's statement of material facts. Further, the district court properly concluded that Aramark was entitled to summary judgment. The undisputed facts establish that Ammons was incapable of performing the essential functions of his job with or without reasonable accommodations. Finally, we conclude that Aramark engaged in the required interactive process. For these, and the foregoing reasons, we affirm.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*