# In the
# United States Court of Appeals
## For the Seventh Circuit

————————

No. 04-2173

FEDERAL TRADE COMMISSION,

*Plaintiff-Appellee,*

v.

BAY AREA BUSINESS COUNCIL, INC., a Florida
Corporation, BAY AREA BUSINESS COUNCIL CUSTOMER
SERVICE CORP., a Florida Corporation, AMERICAN
LEISURE CARD CORP., a Florida Corporation, et al.,

*Defendants-Appellants.*

————————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02-C-5762—**John W. Darrah**, *Judge.*

————————

ARGUED MAY 6, 2005—DECIDED AUGUST 25, 2005

————————

Before KANNE, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* In 2002 the Federal Trade Com-
mission ("FTC") initiated an action for injunctive and other
equitable relief against several Florida corporations and
their officers and directors. *See* 15 U.S.C. §§ 53(a)-(b)
(giving FTC power to bring suit in district court and seek
preliminary injunction), 57b (authorizing FTC to bring suit
and seek equitable relief); 15 U.S.C. § 6101-08 (Tele-
marketing and Consumer Fraud and Abuse Prevention
Act). The FTC alleged that the following interrelated
corporations, run by Peter Porcelli, Bonnie Harris, and

Christopher Tomasulo, engaged in deceptive trade practices in violation of section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.1-10.9: Bay Area Business Council, Inc. ("BABC"); Bay Area Business Council Customer Service Corp. ("BABC Customer Service"); American Leisure Card Corp. ("American Leisure"); Bay Memberships, Inc.; Bay Vacations, Inc.; and Sr. Marketing Consultants, Inc. In particular, the FTC alleged that the defendants misled consumers into believing that they would receive a credit card in exchange for a hefty "one-time" fee. The district court granted the FTC's motion for summary judgment against all of the corporate defendants and Porcelli and Harris. The defendants appeal, and we affirm.

## I.

The FTC based its action on an alleged telemarketing scheme run primarily out of Largo, Florida. Managing BABC and later American Leisure, Porcelli contracted with a telemarketing company in Utah[1] to call consumers throughout the United States who had recently applied for and been denied consumer credit. Referring to those credit applications, telemarketers opened by saying, "Our records indicate that within the past 12 months, you filed an application for a credit card and you are now eligible to receive your MasterCard." After answering a few short "verification" questions, consumers were told that they were "guaranteed to receive a MasterCard that does not require

---

[1] Although not a named defendant in this case, the Utah telemarketing company, Assail, Inc., was the subject of an FTC action filed in the Western District of Texas. *See FTC v. Assail, Inc.*, 410 F.3d 256, 259 n.1 (5th Cir. 2005) (describing telemarketing "scheme" selling worthless "MasterCards").

a security deposit with an initial pay as you go limit of $2000."

In addition to the "MasterCard," consumers were promised a "fabulous" Florida vacation and a free 30-day trial "BABC membership." These offers, however, did not figure prominently in the script, which focused on the "MasterCard." The card was offered as a way to boost flagging credit ratings, as demonstrated by the following scripted promise: "[N]othing [customer name] looks better on your Equifax credit report than a MasterCard."

This supposed opportunity, however, came at a cost. Telemarketers explained that "like most cards there is a one time processing [fee] of $174.95 plus shipping and handling, which covers the cost of processing the Master-Card order and getting the vacation package delivered to you on a priority basis." In order to pay the fee, consumers were required to provide personal account information. After obtaining an account number and securing agreement from the consumer, telemarketers played an automated "disclosure" concluding with, "you agree to everything we spoke about over the phone today, Correct?" Within days of the call, BABC and American Leisure debited customer accounts for anywhere from $199 (including "shipping and handling") to $499.

Some time later, customers received the "MasterCard" and accompanying package from BABC or American Leisure. Instead of a credit card, the package contained an "acceptance form" for a "ChexCard™ MasterCard®." The card stated "Bay Area Business Council" prominently across the top and contained a copy of the MasterCard logo in the lower right-hand corner. The back contained a meaningless painted-on black stripe in place of the customary magnetic strip on credit and debit cards. The explanatory material revealed that the card was a "stored value card" that the customer could receive only after mailing in a $15 activa-

tion fee. After the actual card arrived (four to six weeks later), it could only be used if a customer pre-loaded his or her own funds onto it.

In addition to the inoperable "ChexCard," customers received information on redeeming their free vacation (a time share presentation) and on their BABC "membership." The "membership" supposedly entitled consumers to take advantage of numerous "free" goods and services, such as gasoline, nationwide long distance, internet access, voice mail, and film developing. Although this was not mentioned in the materials, the privilege of BABC membership cost the consumer $10 a month. The only notice of the fee was contained in the automated "disclosure" played in the initial sales call, where it was revealed that the $10 would be taken directly from the consumer's account each month.

Not surprisingly, BABC received a host of complaints from customers who thought they had been going to receive a credit card. Incorporated separately but doing business under the name Bay Area Business Council, BABC Customer Service handled customer's complaints and requests for refunds. Special Technologies, Inc. essentially succeeded BABC Customer Service in July 2002. Both operated from a suite in Largo next to the offices of Porcelli and Harris. That suite received all calls placed to the toll free numbers for BABC, American Leisure, Sr. Marketing Consultants, and Bay Memberships, Inc. In addition to calls from disgruntled consumers, corporate records reveal that between November 2001 and July 2002, BABC received over 900 written consumer complaints forwarded from the Better Business Bureau, state attorney generals' offices, and private lawyers.

The remaining corporate defendants also worked in conjunction with BABC. Like BABC Customer Service, Sr. Marketing Consultants, Inc. did business under BABC's name. Sr. Marketing Consultants, however, had only

four employees, three of whom were related to Porcelli. They operated from Porcelli's mother-in-law's home in Dunedin, Florida. Sr. Marketing Consultants charged BABC and American Leisure for the "ChexCards," and then, through a series of transactions, gave the proceeds to Harris, who handled most of BABC's finances. At the end of July 2002, Porcelli created Bay Memberships, Inc. as a way to ensure that banks, which had begun refusing to process payments to BABC and American Leisure, would continue to charge customers. In the three weeks that Bay Memberships, Inc. operated, it processed approximately $200,000 in debits from customer accounts. Although it is not entirely clear from the record, Bay Vacations, Inc. was apparently another shell corporation doing business for BABC.

In August 2002, the FTC filed its action alleging that BABC, Inc., BABC Customer Service, American Leisure, Porcelli, Tomasulo, and Harris violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and multiple provisions of the TSR by engaging in deceptive trade practices. The FTC later amended its complaint to name Bay Memberships, Inc., Bay Vacations, Inc., and Sr. Marketing Consultants, Inc. as defendants (collectively the "corporate defendants"). The FTC also secured an ex parte temporary restraining order with an accompanying freeze on the defendants' assets. On August 15, 2002, a temporary receiver, accompanied by FTC employees, entered the corporate defendants' premises in Largo, Florida to seize business records and shut down operations pursuant to the restraining order.

After conducting extensive discovery, the FTC moved for summary judgment against the corporate defendants, Porcelli, and Harris.[2] With its motion the FTC filed the

---

[2] The district court later approved a stipulated settlement (continued...)

required Northern District of Illinois Local Rule 56.1(a)(3) statement of undisputed material facts. In response to the FTC's motion, the defendants filed a document averring that an attached affidavit sworn by Porcelli contested "the vast majority of all facts listed as undisputed by the FTC." The defendants also submitted affidavits from three former BABC employees and one former BABC Customer Service employee. The affidavits made the following three assertions: (1) that most BABC consumers who called asked about their vacation package, not about a credit card, (2) that BABC had a consumer refund policy, and (3) that Porcelli was in Canada from May 2002 until shortly after BABC was shut down by the FTC in August. The district court concluded that the defendants' response failed to comply with Local Rule 56.1. It thus accepted as true all the facts in the FTC's Rule 56.1 statement.

On that record, the court granted the FTC's motion for summary judgment. The court concluded that the undisputed facts established that the defendants had violated section 5 of the FTC Act by misleading reasonable consumers into believing they would receive a credit card. *See* 15 U.S.C. § 45(a) (forbidding deceptive practices affecting commerce). This deception, the court concluded, also violated 16 C.F.R. § 310.3(a)(2)(iii) (prohibiting misrepresentations about any material aspect of a sales offer) and § 310.3(a)(4) (forbidding misleading statements to induce payment for goods). And the court determined that the defendants violated 16 C.F.R. § 310.3(a)(1)(i) by failing to tell consumers about the extra $15 fee required to obtain the "ChexCard," *id.* (requiring clear and conspicuous

---

[2] (...continued) agreement between the FTC and the sole remaining defendant, Christopher Tomasulo. The agreement contemplates Tomasulo's adherence to a permanent injunction that mirrors the one ultimately entered against the other defendants.

disclosure of all costs associated with goods offered for sale). Finally, the district court concluded that Porcelli and Harris were individually liable for the corporate defendants' deceptive practices because both had authority to control the corporate defendants and knew about their deceptive practices. The court then entered an order permanently enjoining the defendants from telemarketing, promoting or selling credit-related products, making misleading statements to consumers, failing to comply with the TSR, or disclosing any information about customers except to the FTC. The court also held the corporate defendants, Harris, and Porcelli jointly and severally liable for $12.5 million in consumer redress. *See* 15 U.S.C. § 57b(b) (giving court jurisdiction to authorize consumer redress for a corporation's deceptive trade practices).

## II.

The defendants' primary argument on appeal concerns the district court's enforcement of Northern District of Illinois Local Rule 56.1. That rule requires parties moving for summary judgment to submit with their motion "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." N.D. Ill. R. 56.1(a)(3). The statement must be organized by numbered paragraphs and refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the listed facts. The party opposing summary judgment must then submit a response to each numbered paragraph, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *Id.* 56.1(b)(3)(A). The reply must also contain numbered paragraphs with "any additional facts that require the denial of summary judgment," supported by citations to the record. *Id.* 56.1(b)(3)(B). Finally, the rule

provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."

Concluding that the defendants' affidavits did not comply with the strictures of the rule, the district court disregarded them. The defendants, however, maintain that the district court should have considered Porcelli's thirty-three page affidavit, which they believe complied with Rule 56.1. They characterize the statements in Porcelli's affidavit as "admissible evidence" and insist that he responded to the undisputed facts listed by the FTC. We review the district court's enforcement of the local rules for an abuse of discretion. *E.g.*, *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules. *See Koszola v. Bd. of Educ.*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Ammons*, 368 F.3d at 817; *Bordelon v. Chi. School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (collecting cases).

We are hard-pressed to see how Porcelli's affidavit could constitute compliance with Rule 56.1. The defendants insist that Porcelli's affidavit "specifically addressed in corresponding paragraph numbers" the facts in the FTC's Rule 56.1 statement. This is untrue. By way of example, the eighth paragraph in the FTC's Rule 56.1 statement asserts that American Leisure did business as "First American Leisure Card" or "1st American Leisure Card." In the "corresponding" paragraph of his affidavit, Porcelli claims to "deny, to [his] knowledge" that sales representatives led consumers to believe that they would receive credit cards for an advance fee. And paragraph twelve of the FTC's Rule 56.1 statement says that BABC and American Leisure entered into contracts with a company in St. George, Utah

to telemarket for them. Paragraph twelve of Porcelli's affidavit, however, makes the unrelated claim that "BABC and [American Leisure] telemarketing scripts . . . included language regarding a vacation package." As demonstrated by the preceding examples, Porcelli's affidavit in no way constitutes "a concise response . . . to each numbered paragraph" in the FTC's statement. Indeed, many portions bear no relationship at all to the facts set forth by the FTC.

Moreover, with the exception of a sole reference to the defendants' answer to the FTC's amended complaint, Porcelli's affidavit fails to cite a single piece of record evidence to support its assertions. *See Bradley v. Work*, 154 F.3d 704, 708 (7th Cir. 1998) ("act of specifically correlating evidence in the record to factual propositions" is "key" to system prescribed by local rules such as 56.1). In short, Porcelli's affidavit utterly fails to conform with the requirements of Rule 56.1, and the district court had no obligation to construe it as compliant. We have noted before that rules like 56.1 "provide[ ] the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court." *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995). Instead of employing those means, the defendants chose to submit Porcelli's affidavit and the affidavits of four of his former employees. Having reviewed the affidavits, we concur in the district court's judgment that they consist of "unsupported and irrelevant" conclusions. The court was thus well within its discretion to reject the defendants' submissions. *See Ammons*, 368 F.3d at 817-18 (no abuse of discretion for court to strike responses that "simply denied an allegation and provided no citation whatsoever"); *Bordelon*, 233 F.3d at 528-29 (upholding district court's decision to strike statement "full of argument, evasion, and improper denials").

We also reject the defendants' related argument that the district court "overlooked" evidence giving rise to disputed issues of material fact. To uncover this evidence, the

defendants suggest the district court should have harked back to affidavits submitted with their answer to the FTC's amended complaint and their motion in opposition to the preliminary injunction. But local rules such as 56.1 exist precisely because the district court is not "obliged . . . to scour the record looking for factual disputes." *Waldridge*, 24 F.3d at 922. Moreover, the affidavits are unhelpful because many of the statements in them were subsequently discredited by deposition testimony and other evidence uncovered in discovery. *See, e.g., Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005) (reiterating rule that a party may not create an issue of fact with an affidavit containing conclusions that contradict depositions or other sworn testimony); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 318-19 (7th Cir. 2003) (same).

## III.

Accordingly, in our de novo review of the court's grant of summary judgment, we consider only those facts in the FTC's Rule 56.1 statement, which is amply supported by citations to the relevant record evidence. Although we accept as true the facts in the FTC's Rule 56.1 statement, we still view them in the light most favorable to the defendants in determining whether there exist disputed issues of material fact. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986); *Laborers' Pension Fund v. RES Env't Servs., Inc.*, 377 F.3d 735, 737 (7th Cir. 2004). Although the defendants aver generally that there are disputed issues of fact that make summary judgment improper, nothing they point to undercuts the FTC's undisputed evidence that they engaged in unfair trade practices, *see* 15 U.S.C. § 45(a), and violated multiple provisions of the TSR, *see* 16 C.F.R. § 310.1-10.9.

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C.

§ 45(a)(1). The FTC is empowered to initiate federal court actions to enforce violations of section 5 and seek appropriate equitable relief. *Id.* §§ 53(a)-(b), 57b. The FTC may establish corporate liability under section 5 with evidence that a corporation made material representations likely to mislead a reasonable consumer. *See FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988). The FTC is not, however, required to prove intent to deceive. *FTC v. Freecom Communications, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005)*; FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *World Travel*, 861 F.2d at 1029. Additionally, the omission of a material fact, without an affirmative misrepresentation, may give rise to an FTC Act violation. *Amy Travel*, 875 F.2d at 573; *World Travel*, 861 F.2d at 1029. The corporate defendants do not dispute the district court's conclusion that they operated as a "common enterprise" such that they are jointly and severally liable for the injuries caused by their violations of the FTC Act and the TSR. We thus consider them collectively when analyzing corporate liability.

Throughout their brief, the defendants maintain that they never sold a credit card. They characterize this issue as a material fact in dispute. The FTC, however, does not dispute that the defendants did not actually sell credit cards. Indeed, their failure to provide a "credit card" lies at the heart of this case. We take the defendants at their word that they never sold a credit card. Unfortunately, they misled consumers into believing that was exactly what they were doing. *See Freecom Communications*, 401 F.3d at 1202 (in analyzing whether act or practice is deceptive, principal inquiry is the practice's likely effect on mind of ordinary consumer).

One look at the scripts used by telemarketers for BABC and American Leisure confirms that the corporate defendants misled reasonable consumers into believing they

would receive a credit card. The script opens by referring to the consumer's recent application for "a credit card." The potential customer is then told, "you are now eligible to receive your MasterCard." It is hard to imagine what consumer would *not* construe this as an offer for a credit card. Indeed, the entire script is tailored to giving consumers that impression. From calling the card a "MasterCard" to promising that nothing would look better on an Equifax credit report, telemarketers gave consumers the impression that they were going to receive a credit card in the mail. Instead, they received a useless card with a MasterCard logo. From that, a consumer could mail additional funds to receive a functional "ChexCard," which could only be used when the consumer pre-loaded it with her or her own funds. We think it safe to say that no reasonable consumer would pay close to $200 for the *opportunity* to order this "ChexCard." Any doubt that consumers were misled is dispelled by the number of consumer complaints. BABC Customer Service records reveal that in the two-month window from June to August 2002, over 200 consumers called to complain that they thought they would be getting a credit card. Accordingly, the corporate defendants violated section 5 of the FTC Act. *See FTC v. World Media Brokers*, No. 04-2721, slip op. at 7 (7th Cir. July 27, 2005).

The evidence also establishes multiple violations of the TSR, 16 C.F.R. § 310.1-10.9, the FTC's Trade Regulation promulgated to implement the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101-6108. The FTC alleged that the defendants violated three provisions of the TSR, which we consider in turn.

Section 310.3(a)(1)(i) requires telemarketers to clearly and conspicuously disclose "[t]he total costs to purchase, receive, or use . . . any goods and services" offered for sale. 16 C.F.R. § 310.3(a)(1)(i). Although telemarketers assured consumers that the "MasterCard" had a "one time" fee of $174.95 plus shipping and handling, that was not the case.

After a consumer's checking account was debited anywhere from $199 up to $399, he or she received the BABC "membership" materials in the mail. Those materials contained the useless "ChexCard™ MasterCard®" with an accompanying form explaining that it was not a credit card. In order to use the "stored value card" consumers then had to mail an additional, previously undisclosed $15 in certified funds to "SMC Bank Card Offer" (presumably Sr. Marketing Consultants, the four-employee operation run from Porcelli's mother-in-law's home). By failing to provide advance warning of the additional $15 fee, the corporate defendants violated § 310.3(a)(1)(i).

Likewise, the defendants violated § 310.3(a)(2)(iii), which prohibits telemarketers from misrepresenting any material aspect of the performance of the goods or services offered for sale. As our discussion regarding section 5 of the FTC Act makes clear, the corporate defendants misled consumers into believing that they would receive a credit card. We need not linger on the obvious point that the lack of any available credit on the "MasterCard" qualifies as a material aspect of its performance subject to disclosure. *Cf. World Media*, slip op. at 7-8 (defendants' failure to disclose illegality of sales offer violated related provision of TSR requiring disclosure of all material restrictions on goods or services).

Finally, the defendants violated § 310.3(a)(4) by leading consumers to believe that the substantial fee charged would be used to secure a credit card on their behalf. Subsection (a)(4) forbids telemarketers from making a false or misleading statement to induce payment for goods or services. 16 C.F.R. § 310.3(a)(4); *see also World Media*, slip op. at 8. In addition to suggesting that consumers would receive a credit card, the telemarketers falsely assured consumers that the card would boost their credit ratings. Despite the promise that "nothing" looked better on an "Equifax credit report than a MasterCard," use of the pay-as-you go

"Mastercard" was not reported to credit reporting bureaus like Equifax. No doubt this false promise induced consumers, targeted for their poor credit histories, into paying for the supposed "MasterCard."

That leaves Porcelli and Harris. Upon establishing corporate liability, the FTC must demonstrate that the individual defendants either participated directly in the deceptive acts or practices or had authority to control them. *World Media*, slip op. at 8; *Amy Travel*, 875 F.2d at 573; *see also Freecom Communications*, 401 F.3d at 1204; *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997). Additionally, the FTC is obligated to show that the individual defendants either knew or should have known about the deceptive practices. *World Media*, slip op. at 8; *Amy Travel*, 875 F.2d at 573-74. It is not, however, required to prove subjective intent to defraud. *Amy Travel*, 875 F.2d at 573-74. Instead, the FTC may fulfill the knowledge requirement with evidence that the individuals had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* at 574 (citation and internal quotations omitted).

We begin with Porcelli. On appeal Porcelli never directly takes issue with the district court's conclusion that he should be held individually liable for the corporate misrepresentations. Instead, he makes a passing reference to a former BABC's employee's affidavit to the effect that Porcelli was in Canada from May 2002 until after BABC was closed in August 2002. Even if we were to consider the affidavit, it does not create a genuine issue over whether Porcelli had the requisite authority and knowledge to be individually liable. Porcelli is the owner and chief executive officer of every corporate defendant except Bay Vacations, Inc. Acting in that role he made countless decisions that demonstrate his authority to control the corporate defen-

dants. *See World Media*, slip op. at 9 (service as director, president, and secretary of multiple corporations demonstrated defendant's authority to control); *Amy Travel*, 875 F.2d at 573 (authority to control may be demonstrated by active participation in the corporate affairs, including assuming duties as a corporate officer). For example, he controlled decisions such as who would perform telemarketing for BABC and American Leisure Corp. He also created Bay Memberships, Inc. to secure continued payments from banks becoming suspicious of BABC. As the mastermind behind the entire scheme, there is no question that Porcelli had authority to control the defendant corporations. *See Amy Travel*, 875 F.2d at 574-75.

Nor does Porcelli's stay in Canada diminish the evidence that he knew about the corporations' deceptive practices. He testified in his deposition that while in Canada he received regular e-mails that kept him apprised of the corporate affairs. Indeed, it was from Canada that Porcelli wrote the following e-mail revealing his plan to keep forming new corporate entities to staunch the flow of consumer complaints: "[W]hen it is at the inquiry stage, where we have a few unhappy people, but no epidemic[,] we switch to the new company[.] . . . [T]he turndown of complaints will make [American Leisure Corp.] disappear from the radar screen to pursue." Then when the newly formed company "start[s] to build up the sales and coml\plaints [sic] . . . we keep the complaints down and set up a successor even quicker in another state, so that the temperature never gets high." Not surprisingly, Porcelli makes no attempt to explain the e-mail, which goes far toward establishing his knowledge of the corporations' deceptive practices. *See id.* at 574-75 (knowledge shown in part by "high volume of consumer complaints"). In addition to knowing about the number of consumer complaints, Porcelli received a letter from the state of Montana instructing him to cease telemarketing there because the scripts misled consumers into believing

they would receive a credit card. This letter, as well as a suit by the state of North Carolina (resulting in a ban on sales to North Carolina), more than adequately alerted him to the corporations' deceptive trade practices. *See World Media*, slip op. at 9-10.

Harris, for her part, claims that there is a genuine issue of material fact over whether she was "a salaried employee or an officer with authority to control." To support her claim, she points to her affidavit in the district court stating that she is not an "owner or stockholder" in any of the corporations and makes a salary of $1250 a week. In addition to being evidence that the district court properly disregarded, her assertion is irrelevant. Harris cites no authority, nor are we aware of any, to the effect that receiving a weekly salary is somehow inconsistent with having corporate control or knowledge of corporate affairs. The record establishes that Harris handled the corporate finances for American Leisure, and also transferred funds to pay expenses for BABC, BABC Customer Service, and Special Technologies. She also had signing authority on the corporate accounts for BABC, BABC Customer Service, American Leisure, Sr. Marketing Consultants, Inc., and Bay Memberships, Inc. and was authorized to use Porcelli's signature stamp. Thus, Harris had ample authority to control the corporate defendants. *See Publ'g Clearing House*, 104 F.3d at 1170.

And like Porcelli, she was aware of the near-constant stream of complaints from customers who thought they would receive a credit card in exchange for their payment. She also knew that banks were refusing to debit customer accounts for payments to BABC and American Leisure. In October 2001, she sent the telemarketing company an e-mail saying, "We have been deluged with check returns from our bank this week." To claim ignorance in the face of the consumer complaints and returned checks amounts to, at the least, reckless indifference to the corporations'

deceptive practices. *See Amy Travel*, 875 F.2d at 574-75.

Finally, nowhere do Porcelli and Harris suggest that the corporations' deceptive practices did not harm consumers. The FTC submitted declarations from multiple consumers who purchased the defendants' package, only to learn later that it did not contain a credit card. These consumers also attempted unsuccessfully to receive a refund for the money debited from their accounts. Thus, the FTC has established consumer injury, the final requirement for individual liability under the FTC Act. *See Freecom Communications*, 401 F.3d at 1205-06; *Amy Travel*, 875 F.2d at 573.

## IV.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the FTC.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—8-25-05