77 F.3d 54
 Robert ULFIK, Plaintiff-Appellant,
v.
METRO-NORTH COMMUTER RAILROAD, Defendant-Appellee.
METRO-NORTH COMMUTER RAILROAD COMPANY, Third-Party Plaintiff,
v.
YONKERS CONTRACTING CORP., Third-Party-Defendant-Appellee.
YONKERS CONTRACTING CORP., Second Third-Party-Plaintiff-Appellee,
v.
PROGRESSIVE PAINTING CORPORATION, Second
Third-Party-Defendant-Appellee.
 No. 641, Docket 95-7495.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 5, 1995.
Decided Feb. 23, 1996.
 
 L. Kevin Sheridan, New York City (Jesse C. Sable, Frederic M. Gold, Sable & Gold, New York City, on the brief), for plaintiff-appellant.
 Paul A. Krez, Krez & Peisner, New York City, on the brief, for defendant-appellee.
 Arthur L. Salmon, Killarney & Salmon, New York City, submitted a brief for third-party-defendant-appellee Yonkers Contracting Corp.
 Thomas Donald Hughes, Hayes & Ryan, New York City, submitted a brief for second third-party-defendant-appellee Progressive Painting Corporation.
 Before: NEWMAN, Chief Judge, FEINBERG and CARDAMONE, Circuit Judges.
 JON O. NEWMAN, Chief Judge:
 
 
 1
 This case probes the issues of negligence and causation in the context of a personal injury lawsuit arising under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51-60 (1988). Plaintiff-appellant Robert Ulfik appeals from the April 26, 1995, judgment of the United States District Court for the Southern District of New York (John S. Martin, Jr., Judge) granting a motion at the end of Ulfik's case-in-chief for judgment as a matter of law in favor of defendant-appellee Metro-North Commuter Railroad ("Metro-North"). Ulfik contends that the District Court erred in ruling that there was insufficient evidence to support a jury determination of either negligence or causation. Because we believe that, under the standards governing negligence and causation in FELA cases, the evidence was sufficient to create issues of fact for the jury to decide, we reverse the judgment of the District Court and remand for a new trial.
 
 Background
 
 2
 Assessing the evidence, as we must, in the light most favorable to the non-moving party, we believe that the jury would have been entitled to find the following facts concerning the injuries that Robert Ulfik sustained after falling down a flight of stairs in Grand Central Terminal. In 1991, Ulfik was employed by Metro-North as a leverman in an underground railroad tower called "Tower U," which is located beneath 57th Street and Park Avenue in New York City. Ulfik's duties included operating the switching device at Tower U that helps to control the trains entering and leaving Grand Central Terminal. On July 15, 1991, Ulfik was scheduled to work the second shift from 2:00 p.m. to 10:00 p.m. He was assigned to work with two other employees, both of whom were to start their shift at 3:00 p.m. When Ulfik arrived for work that day, however, he noticed the unusual circumstance that two of the first-shift workers, Donald Hines and Alexander McCracken, were up on the street, rather than at their underground stations. When Ulfik went down to Tower U, he discovered that there were three supervisors manning the tower. One of the supervisors informed him that Hines and McCracken had become sick due to their inhalation of fumes from either paint or solvent that was being sprayed in the railroad tunnels.
 
 
 3
 At around 2:45 p.m., after the supervisors had left, Ulfik began to experience a burning sensation in his nose and eyes. At 3:00 p.m., his two co-workers, Joe Hunt and Anthony Franzese, arrived. At around 4:00 p.m., Ulfik began to suffer from even more severe symptoms, including an extreme headache and dizziness. Hunt and Franzese also began to experience similar symptoms. Several times, Hunt and Franzese called their supervisors, asking to be relieved from work, but were told that they could not leave their stations without the permission of the chief dispatcher. At around 6:45 p.m., a train master came down to interview Ulfik, Hunt, and Franzese concerning their physical ailments. Each of the three co-workers was also asked to fill out an Accident/Injury Report. Finally, at 8:00 p.m., Ulfik, Hunt, and Franzese were allowed to leave their stations when their replacement shift arrived.
 
 
 4
 After work, Ulfik went directly to the emergency room of a nearby hospital, where he was examined by a doctor and underwent a series of pulmonary tests. Ulfik was never apprised of the results of those tests. He was simply discharged from the emergency room and told to go home and rest. He was also advised that he should visit his own doctor if the symptoms persisted. Feeling dizzy the next morning, Ulfik went to visit his private doctor, Dr. Maximo Levin. Dr. Levin performed another series of pulmonary tests and instructed Ulfik to stay at home until the test results came back or until he felt better. Dr. Levin also told Ulfik to schedule a follow-up appointment in one week for July 23.
 
 
 5
 During the week, Ulfik continued to experience intermittent dizziness and did not return to work. He suffered from dizziness approximately seven or eight times a day at the beginning of the week, diminishing by the end of the week to perhaps three times a day. On July 17, Metro-North contacted Ulfik and told him to report to its medical office for an examination with Dr. Hurley on July 23. Believing that he had no choice, Ulfik agreed to the appointment. On the morning of July 23, however, Ulfik first went to see Dr. Levin and reported that he was still suffering from occasional dizziness. Dr. Levin told Ulfik that he should not go back to work yet, and provided Ulfik with a note to that effect. Dr. Levin also scheduled another follow-up appointment for July 30.
 
 
 6
 After his appointment with Dr. Levin on July 23, Ulfik called the Metro-North medical office and told the clerk on duty that he had been instructed by his doctor to stay at home. The clerk replied that Ulfik's supervisor had ordered the examination with Dr. Hurley, and that he was required to appear. Later that day, Ulfik's wife drove him to the Metro-North medical office, which is located in Grand Central Terminal. Inside the Terminal, Ulfik met his co-worker, Joe Hunt, who had also been ordered to appear for an appointment that day. As Ulfik and Hunt were walking down a flight of stairs toward the medical office, Ulfik experienced a sudden wave of dizziness. He lost his balance, fell backwards, and slipped down the stairway.
 
 
 7
 Eventually, with the help of Hunt, Ulfik got up and proceeded to walk towards the medical office. When he arrived, he reported his accident to the secretary, and received some medical attention from one of the assistants. Later, Dr. Hurley came in, asked Ulfik a few questions, and gave him some forms for Dr. Levin to complete. Ulfik was then allowed to leave. On the afternoon of July 23, when Ulfik returned home, he began to notice some back and hip pain. The next day, he experienced such severe pain that he called Dr. Levin for advice. Dr. Levin referred Ulfik to an orthopedic specialist. Ulfik went to the specialist's office that afternoon, where a doctor examined him and prescribed a course of physical therapy for Ulfik to perform three times a week.
 
 
 8
 On July 30, Ulfik went back to Dr. Levin for his third appointment. Dr. Levin told Ulfik that the test results had come back and that they failed to reveal any problems. Nonetheless, Ulfik continued to suffer from dizziness for at least a few more weeks until mid-August, when the dizziness subsided entirely. Ulfik's back and hip pain persisted. In mid-August, Ulfik also began to develop some pain in his right knee. From August 1991 to October 1992, Ulfik's condition deteriorated despite his physical therapy. He developed a limp on his right side. In October 1992, Ulfik decided to consult a new physician, Dr. Hedrych, who had been recommended to Ulfik by his attorney. Under the care of Dr. Hedrych, Ulfik continued his course of physical therapy. He was also referred to an orthopedic surgeon, who performed arthroscopic surgery on Ulfik's right knee to remove some torn cartilage. Ulfik's physical condition, however, did not improve. These impairments stemming from his fall down the flight of stairs comprised the injuries for which Ulfik sought compensation in his FELA lawsuit.
 
 
 9
 At trial, Ulfik presented his own testimony, as well as the testimony of Dr. Hedrych and two of Ulfik's co-workers, Hines and Hunt. Ulfik testified concerning the events that occurred between July 15, 1991, and October 1992. He also presented the Accident/Injury Reports that he had completed on July 15. Dr. Hedrych, testifying as Ulfik's expert witness, opined that Ulfik's back, hip, and knee injuries had resulted from his July 23 accident on the stairway. Dr. Hedrych was unable to give an opinion as to the original cause of Ulfik's dizziness. Hines and Hunt both testified that on July 15 they smelled an odor of chemical fumes in Tower U. Both also stated that they suffered that day from headaches, nausea, and dizziness. Questions concerning their post-July 15 physical conditions, however, were successfully objected to on the ground of relevance. Hunt also corroborated Ulfik's testimony concerning his fall down the flight of stairs. Finally, Ulfik presented the deposition testimony of a Metro-North train master who stated that around July 15, a contractor, third-party defendant-appellee Yonkers Contracting, was engaged in rebuilding the tunnel near Tower U. This rebuilding involved the spraying of paint.
 
 
 10
 At the close of Ulfik's case-in-chief, the District Court granted Metro-North's motion for judgment as a matter of law, ruling that there was insufficient evidence on the issues of negligence and causation.
 
 Discussion
 I. Excluded Testimony
 
 11
 At the outset, we deem it necessary to consider one evidentiary issue. Ulfik contends that the District Court erred in excluding the testimony of Hines and Hunt regarding their post-July 15 physical conditions. Although no offer of proof was made, Hines and Hunt presumably would have testified that they continued to suffer from dizziness and other symptoms even after July 15. The District Court, however, excluded this testimony on the ground of relevance. We believe that this ruling was incorrect. Although "[d]eterminations of relevance are entrusted to the sound discretion of the trial judge," United States v. Quiroz, 13 F.3d 505, 514 (2d Cir.1993), we believe that the District Court's ruling constituted an abuse of discretion. See also United States v. Cruz, 797 F.2d 90, 95 (2d Cir.1986) (relevance determinations will be reversed only when arbitrary or irrational).
 
 
 12
 The question of whether Hines and Hunt continued to suffer from dizziness even after July 15 bears directly on the issue of causation in this case. Hines and Hunt were subject to the same working conditions in Tower U on July 15 as Ulfik was. If the two co-workers also suffered from dizziness on July 23 in the same manner as Ulfik did, this would tend to show the existence of a causal connection between the working conditions in Tower U on July 15 and Ulfik's dizziness eight days later. Although Metro-North argues that different intervening circumstances occurring after July 15 would make it difficult to compare Hines and Hunt with Ulfik, we believe that any such differences at most affect the weight of the evidence, not its relevance. The evidence still has the capacity to make the fact at issue--the causal relationship between the conditions in Tower U and Ulfik's symptoms prior to his fall--more probable than it would be without the evidence. See Fed.R.Evid. 401. Furthermore, the circumstances surrounding all three co-workers were sufficiently similar and so readily provable that the possibility for confusion or delay does not substantially outweigh the probative value of the testimony. See Fed.R.Evid. 403. Therefore, on remand, the District Court should allow Hines and Hunt to testify concerning their post-July 15 physical conditions.II. Motion for Judgment as a Matter of Law
 
 
 13
 The Supreme Court has instructed that a relaxed standard of proof concerning causation applies in FELA cases. The test is whether "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury...." Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957); see Gallick v. Baltimore & Ohio Railroad, 372 U.S. 108, 116, 83 S.Ct. 659, 664, 9 L.Ed.2d 618 (1963) (plaintiff's evidence of causation need only be "plausible" to present to jury). The right of the jury to decide issues of fact should also be liberally construed. Gallose v. Long Island Railroad, 878 F.2d 80, 84-85 (2d Cir.1989). Thus, an employer may be held liable under FELA for risks that would otherwise be too remote to support liability at common law. Syverson v. Consolidated Rail Corp., 19 F.3d 824, 826 (2d Cir.1994); Gallose, 878 F.2d at 86.
 
 A. Negligence
 
 14
 In this case, we believe that the District Court erred in finding that Ulfik failed to adduce sufficient evidence to support a determination of negligence.[1] It is undisputed that Metro-North had a duty to provide its employees with a safe workplace. See Gallose, 878 F.2d at 84-85. Metro-North breached this duty if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees. Id. at 85; see also Lindauer v. New York Central Railroad Co., 408 F.2d 638, 640 (2d Cir.1969) (railroad failed to take reasonable measures to protect employees it knew were subject to prolonged exposure to cold).
 
 
 15
 The touchstone of this negligence inquiry is the issue of foreseeability--whether or not Metro-North knew or should have known of the potential hazard. Syverson, 19 F.3d at 826; Gallose, 878 F.2d at 85; see also Gallick, 372 U.S. at 117, 83 S.Ct. at 665 ("[R]easonable foreseeability of harm is an essential ingredient of [FELA] negligence."). The evidence permitted a finding that Metro-North knew on July 15 that paint was being sprayed in the underground railroad tunnels near Tower U. If Metro-North knew or should have known that this paint could cause injury to one of its employees, then Metro-North could be held liable for its negligence in failing to take reasonable precautions. Ulfik presented evidence that on July 15 at least two other employees, Hines and Hunt, smelled chemical fumes in Tower U, that both of them became sick that day, and that Metro-North had direct knowledge of their physical ailments. We believe that this evidence is sufficient to satisfy the requirement of foreseeability.
 
 
 16
 Metro-North argues that Ulfik failed to present any medical evidence concerning the toxicity of the paint. Ulfik, however, need not prove that the paint was toxic, only that Metro-North could have reasonably foreseen that the paint would increase the likelihood of injury, and that Metro-North failed to take reasonable precautions. The Supreme Court's analysis in Gallick is instructive on this point. See Gallick, 372 U.S. at 117, 83 S.Ct. at 665. In Gallick, the railroad permitted a fetid pool of water to exist on its grounds, attracting a variety of vermin and insects. The plaintiff was bitten by an insect in the vicinity of this pool and suffered a severe allergic reaction that ultimately required the amputation of his leg. The railroad argued that it could not be held liable because the plaintiff's injury was unforeseeable. The Supreme Court held that, because the railroad "knew that the accumulation of the pool of water would attract bugs and vermin to the area--it is clear that the jury concluded that the respondent should have realized the increased likelihood of an insect's biting petitioner while he was working in the vicinity of the pool." Gallick, 372 U.S. at 118-19, 83 S.Ct. at 665-66. Thus, the plaintiff was not required to demonstrate specifically that the fetid pool was dangerous or toxic, or that the harmful agent even derived from the pool. Id.
 
 
 17
 Metro-North can prevail no more successfully in this case by arguing that it was unforeseeable that the continued exposure of its employees to potentially noxious paint fumes would cause injury. See Syverson, 19 F.3d at 827-28 (because railroad knew that non-employees could enter rail-yard, injuries caused by homicidal trespasser were foreseeable); Gallose, 878 F.2d at 85 (because railroad could have discovered presence of large dog on premises, injuries caused by dog bite were foreseeable); Burns v. Penn Central Co., 519 F.2d 512, 514 (2d Cir.1975) (because railroad knew that train could be hit by rocks at particular location, death caused by rifle shot at same location was foreseeable). We hold that Ulfik's evidence was sufficient to support a jury finding of negligence on the part of Metro-North.
 
 B. Causation
 
 18
 We believe that Ulfik also presented sufficient evidence to support a finding of causation. In this case, the chain of causation consists of three potential links: (1) whether the paint fumes on July 15 caused Ulfik's dizziness on July 23, (2) whether Ulfik's dizziness on July 23 caused him to fall down the stairs that day, and (3) whether Ulfik's fall down the stairs caused his current debilitated condition. The only contested issue arises as to the first link. Concerning the second link, Ulfik testified that his fall was caused by a sudden wave of dizziness. We believe that his testimony regarding this non-technical matter is sufficient to create an issue of fact for the jury. Concerning the third link, Dr. Hedrych's expert testimony sufficed to show that Ulfik's accident on July 23 caused his current debilitated condition.
 
 
 19
 The only disputed link in the causal chain concerns whether or not the paint fumes on July 15 caused Ulfik's dizziness eight days later on July 23. On this issue, Ulfik presented both his own testimony and the testimony of Hines and Hunt, who stated that after smelling chemical fumes in Tower U on July 15, they suffered from symptoms similar to Ulfik's. Metro-North, however, asserts that this evidence is insufficient as a matter of law to support a showing of causation, because expert medical testimony is required. Metro-North relies on the Ninth Circuit's decision in Claar v. Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir.1994). The plaintiffs in Claar alleged that their exposure to chemicals in the workplace caused a variety of injuries, including dyscalculia (poor arithmetic ability) and spelling dyspraxia (poor spelling ability). The Ninth Circuit upheld summary judgment for the defendant because the plaintiffs could not present any legitimate expert evidence to establish causation. Id. at 504; see also Moody v. Maine Central Railroad Co., 823 F.2d 693, 695 (1st Cir.1987) (requiring expert testimony to show causal connection between workplace harassment and severe emotional trauma).
 
 
 20
 Claar and Moody, however, are distinguishable from this case. In Claar, the Ninth Circuit specifically limited its holding to those situations where some "special expertise [is] necessary to draw a causal inference." Claar, 29 F.3d at 504; see also Moody, 823 F.2d at 695 (if drawing particular conclusion requires specialized knowledge, then expert testimony is required). In Claar, special expertise was thought necessary because of the esoteric nature of the injuries alleged--dyscalculia and spelling dyspraxia. In this case, however, the trier of fact could reasonably determine, without expert testimony, that prolonged exposure to paint fumes would cause headache, nausea, and dizziness. See W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 41, at 270 (5th ed. 1984) ("Circumstantial evidence, expert testimony, or common knowledge may provide a basis from which the causal sequence may be inferred."). Under FELA, the circumstantial evidence presented by Ulfik on this issue was sufficient to create a genuine issue of material fact, and the motion for judgment as a matter of law should have been denied.
 
 
 21
 Accordingly, we reverse the judgment of the District Court and remand for a new trial.
 
 
 
 [1]
 The Supreme Court has not expressly held that a relaxed standard for negligence, as distinguished from causation, applies under FELA. Cf. Gallick, 372 U.S. at 117, 83 S.Ct. at 665. Yet numerous appellate courts, including ours, have construed the statute, in light of its broad remedial nature, as creating a relaxed standard for negligence as well as causation. See Mullahon v. Union Pacific Railroad, 64 F.3d 1358 1364 (9th Cir.1995); Syverson v. Consolidated Rail Corp., 19 F.3d 824, 825 (2d Cir.1994); Hines v. Consolidated Rail Corp., 926 F.2d 262, 267 (3d Cir.1991)
 Though the issue of negligence is still governed by the common law requirement of foreseeability in order to determine whether or not a defendant is required to guard against a particular risk, the concept of foreseeability has been construed somewhat more liberally in FELA cases than it might otherwise be under common law. See, e.g., Burns v. Penn Central Co., 519 F.2d 512, 514 (2d Cir.1975) (because railroad knew that train could be hit by rocks at particular location, death caused by rifle shot at same location was foreseeable). In any event, in this case we hold that the requirement of foreseeability has been met under either the traditional common law definition of the concept or under the purportedly relaxed standard for FELA.