In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2207

KENT HIGGINS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

KOCH DEVELOPMENT CORPORATION,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:11-cv-81 — **Richard L. Young**, *Chief Judge*.

ARGUED APRIL 9, 2015 — DECIDED JULY 20, 2015

Before FLAUM, RIPPLE, and WILLIAMS, *Circuit Judges*.

FLAUM, *Circuit Judge*. After the district court disqualified plaintiff Kent Higgins's causation expert—enlisted to prove that Higgins developed asthma and reactive airways dysfunction syndrome as a consequence of inhaling chlorine gas at an amusement park—he argued that he did not need an expert to prove negligence at all. Alternatively, Higgins argued that his treating physician could serve as such an expert. The district court disagreed, con-

sidering the causation issue too complex for an unassist-ed jury, and deeming Higgins's treating physician's quali-fications and methodology too uncertain to permit her to opine on such matters. Consequently, the district court granted summary judgment in favor of the defendant. We affirm.

## I. Background

On June 20, 2009, Kent and Jennifer Higgins, along with their two children, visited Santa Claus, Indiana's Holiday World & Splashin' Safari amusement park ("Holiday World," for ease of reference)—owned and operated by defendant Koch Development Corporation. During their stay, the filter pump connected to the park's lazy river (dubbed the "Bahari River") malfunctioned due to a tripped circuit breaker. As the park's staff worked to fix the problem, pool chemicals—bleach and hydrochloric acid—accumulated in the pump. When the pump finally restarted, these chemicals discharged into the water and a cloud of chlorine gas released into the air.

At that moment, the Higginses were not near the Ba-hari River. But their niece apparently was—and soon thereafter, the Higginses received a cell phone call alert-ing them that she was "in trouble," prompting them to head in that direction. When they arrived, Kent Higgins ("Higgins") inhaled an unspecified amount of chemical fumes that lingered in the air. Complaining of chest tightness, burning eyes, shortness of breath, and nausea, Higgins visited the emergency room later that day, where he was diagnosed with "mild chemical exposure" and discharged with instructions to follow up with his prima-ry care physician.

Higgins saw a pulmonologist later that summer, but waited more than a year before consulting his primary care physician, who referred Higgins to a second pulmonologist, Dr. Linda Haacke. Dr. Haacke diagnosed Higgins with reactive airways dysfunction syndrome ("RADS") and chronic asthma on August 18, 2010 (more than fourteen months after the incident at Holiday World). According to Dr. Haacke, RADS is a syndrome that results in an acute change in one's airways functions, and generally occurs following a single exposure to a significant amount of irritant. Wheezing, bronchospasm, and shortness of breath are symptomatic of both RADS and asthma. Dr. Haacke based her diagnosis on her evaluation of Higgins, coupled with the results of a pulmonary function study conducted by the pulmonologist that Higgins had seen a year earlier. Since his initial visit, Higgins has seen Dr. Haacke about once every six months, and she continues to prescribe him medication for his conditions.

In May 2011, Higgins brought this negligence suit against Koch Development Corporation.[1] To prove his case, Higgins sought to designate Dr. Anthony Margherita (who examined Higgins for purposes of this litigation) as his causation expert. The district court, however, granted Koch's motion to disqualify Dr. Margherita for

---

[1] In addition to damages for Higgins himself, the complaint sought medical expenses allegedly incurred by Higgins's wife, Jennifer; their two children; and another family, the Taylors (all of whom apparently also inhaled chemical fumes at Holiday World on June 20, 2009). But those claims were resolved in the district court and are not relevant to this appeal.

failing to establish a reliable methodology (a ruling that Higgins does not challenge on appeal). Shortly thereafter, Koch filed a motion for summary judgment, arguing that Higgins could not prove that the chemical fumes caused his injuries.

In opposition, Higgins—now without a causation expert—tried to persuade the district court that he did not need an expert to testify regarding causation in order to prove his case. Alternatively, he argued that Dr. Haacke should be permitted to serve as such an expert. The district court disagreed on both accounts, finding an expert essential to a jury's understanding of the issues and—on the record before it—deeming Dr. Haacke unqualified to opine on chlorine's effects on the human pulmonary system and her methodology too uncertain to determine its reliability. Without a proper causation expert, the district court concluded, Higgins could not prove his negligence claim, and so the court granted summary judgment in favor of Koch.

Higgins appeals.

## II. Discussion

We review a district court's grant of summary judgment de novo. *Fix v. Quantum Indus. Partners LDC*, 374 F.3d 549, 552 (7th Cir. 2004). However, our review of the district court's decision concerning the admission of expert testimony, even in the summary judgment context, is slightly more nuanced. We review de novo whether the district court properly followed the framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *United States v. Hall*, 165 F.3d 1095, 1101

(7th Cir. 1999). If the district court properly applied that framework (and Higgins concedes that, in evaluating the sufficiency of Dr. Haacke's opinion testimony, it did), we review the court's decision to exclude expert testimony—that is, its application of the *Daubert* framework—for an abuse of discretion. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010).

In this diversity action, Indiana law governs whether an expert is needed to prove causation. *See Wallace v. McGlothan*, 606 F.3d 410, 419–20 (7th Cir. 2010). Under Indiana law, proving negligence in a case like this one requires proof of both general and specific (or individual) causation. *7-Eleven, Inc. v. Bowens*, 857 N.E.2d 382, 389 (Ind. Ct. App. 2006). The law of the Seventh Circuit acknowledges this same dichotomy. *See Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 641–42 (7th Cir. 2010). General causation refers to "whether the substance at issue had the capacity to cause the harm alleged, while 'individual causation' refers to whether a particular individual suffers from a particular ailment as a result of exposure to a substance." *7-Eleven*, 857 N.E.2d at 389. The district court concluded that, without an appropriate expert, Higgins could not establish specific causation—that is, that the inhalation of chemical fumes caused his health conditions. Higgins, however, maintains that he does not need an expert to establish that the incident at the Bahari River sparked his ailments.

As his primary support, he emphasizes our statement in *Myers* that "[e]xpert testimony is unnecessary in cases where a layperson can understand what caused the injury." 629 F.3d at 643. To illustrate the point, we noted that

"when a plaintiff suffers from a broken leg or a gash when hit by a vehicle, he doesn't need to produce expert testimony." *Id.* Higgins analogizes his injuries to those mentioned in *Myers*, and cites to the Second Circuit's decision in *Ulfik v. Metro-North Commuter Railroad*, 77 F.3d 54 (2d Cir. 1996), which he contends underscores the aptness of his comparison. In *Ulfik*, the court deemed a causation expert unnecessary for a jury to conclude that the inhalation of paint fumes—which the plaintiff breathed for a period of six hours while working in an underground railroad tower—caused the plaintiff to become dizzy, resulting in his falling down a flight of stairs. *Id.* at 55–56 & 59. "[T]he trier of fact could reasonably determine, without expert testimony, that prolonged exposure to paint fumes would cause headache, nausea, and dizziness," the court said. *Id.* at 59–60. Higgins argues that here, too, it is "obvious" that inhaling chlorine gas would cause the injuries he suffers.

We disagree. Unlike dizziness in the wake of extended exposure to paint fumes or a broken leg suffered during a car crash, a typical layperson does not possess the requisite knowledge to draw a causative line, without the assistance of a medical expert, between a brief encounter with chlorine gas and the onset of either RADS (a disease with which, we are confident, most laypeople have no familiarity) or asthma.

Higgins's reply brief insists that, even if a jury would be unable to attribute the onset of these conditions to the events at Holiday World, a jury *is* capable of concluding that he suffered *some* (more minor) injury by inhaling the fumes. (His complaint makes the general allegation that

he "sustained serious personal injuries to his eyes, nose, throat, and lungs.") He concedes that the causation question would be outside "the purview of laypeople" when dealing with "some chemicals," but not chlorine—a "gas [that] is a well-known cause of pulmonary injury," Higgins says. Even if we were to accept that dubious contention as true, the fact remains that the quantity of chlorine actually inhaled by Higgins—which, recall, he encountered some period of time after the gas was released into the air—is entirely unknown. Hospital records from the day of the incident describe his exposure as "mild." And, further complicating the causation issue, Dr. Haacke testified in her deposition (at which she appeared in her capacity as Higgins's treating physician, not as his causation expert) that Higgins is obese and that obesity affects lung volume. Dr. Haacke also testified that there is a genetic component to asthma and that Higgins's father suffered from emphysema. Given so much uncertainty, there is no question that a layperson is incapable of scientifically determining specific causation here without the assistance of an expert.

Higgins points to two Sixth Circuit cases that he reads as reaching conclusions that contradict the one we reach here: *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171 (6th Cir. 2009), and *Gass v. Marriott Hotel Services, Inc.*, 558 F.3d 419 (6th Cir. 2009). Both are readily distinguishable. In *Best*, the plaintiff lost his sense of smell after an open bag of pool chemicals spilled off a store shelf and poured directly onto his face. 563 F.3d at 174. Different from here, though, the issue in *Best* was not whether the plaintiff needed a causation expert to prove his case (Best had a causation expert); rather, the issue was whether the

opinion offered by Best's causation expert was sufficiently reliable to warrant admissibility (the court concluded that it was). *Id.* at 180.

*Gass* (which *Best* mentions in passing, without opining on its applicability) is more helpful to Higgins, but it cannot carry the day. There, the plaintiffs suffered "chemical poisoning" after the staff at the hotel where they were staying filled their room with pesticide gas while spraying for cockroaches. 558 F.3d at 422. The district court granted summary judgment for the hotel, because the plaintiffs lacked a specific causation expert. *Id.* But the Sixth Circuit reversed. *Id.* at 432. In its view, because the plaintiffs "produced ample evidence to demonstrate that at least one of the chemicals Defendants routinely used to exterminate cockroaches … [was] capable of causing their symptoms," a reasonable jury, without the existence of the expert, could find that the plaintiffs' symptoms were caused by their exposure to the pesticides. *Id.*

*Gass* differs from our case in several critical respects. First, the *Gass* plaintiffs complained only of "chemical poisoning" (i.e., headache, itching, dizziness, etc.). *Id.* at 423, 430. The connection between the inhalation of harmful pesticides—exposure to which occurred in a confined hotel room—and those symptoms is fairly obvious, as the Sixth Circuit found. Here, by contrast, Higgins primarily complains that exposure to chlorine fumes caused not *symptoms*, but permanent, chronic conditions—reactive airways dysfunction syndrome and asthma. And, though (as mentioned) he apparently also seeks damages for other nondescript "injuries to his eyes, nose, throat, and

lungs," the causative connection Higgins asks a jury to make in this case—which involves an undetermined quantity of airborne chlorine, inhaled outdoors after some unspecified interval of time following the release of the gas—is far less apparent than the causation question in *Gass*. Second, and more fundamentally, the *Gass* plaintiffs had an expert who testified as to general causation—that is, that pesticides are capable of causing the symptoms about which the *Gass* plaintiffs complained. Here, Higgins argues that no causation expert is needed, period.

In any event, *Gass* applied Michigan—not Indiana—law in reaching its conclusion. And Indiana law makes clear that "questions of medical causation of a particular injury are questions of science necessarily dependent on the testimony of physicians and surgeons learned in such matters." *Armstrong v. Cerester USA, Inc.*, 775 N.E.2d 360, 366 (Ind. Ct. App. 2002) (quoting *Hannan v. Pest Control Servs. Inc.*, 734 N.E.2d 674, 679 (Ind. Ct. App. 2000)). This comports with our decision in *Myers*, where we made clear that "when there is no obvious origin to an injury and it has multiple potential etiologies, expert testimony is necessary to establish causation." 629 F.3d at 643 (citation and internal quotation marks omitted). And that is particularly true in a case, like the one before us, involving an allegation that exposure to a chemical caused permanent and debilitating lung dysfunction. Without an expert, a plaintiff in such a complex case would be free—as Judge Boggs warned in his dissent in *Gass*—to prove his allegations relying on the logical fallacy "*post hoc ergo propter hoc*" ("the fallacy of saying that because effect A happened at some point after alleged cause B, the alleged

cause was the actual cause"). 538 F.3d at 434–35. For all of these reasons, we conclude that a causation expert is required in this case.

We therefore turn to an evaluation of Higgins's contention that Dr. Haacke can serve as such an expert. Underscoring the last-ditch nature of Higgins's argument—invoked only after his proposed expert, Dr. Margherita, was deemed unqualified to testify—Higgins never disclosed Dr. Haacke as an expert witness pursuant to Federal Rule of Civil Procedure 26. Rule 26(a)(2) requires a litigant to disclose the identity of its expert witnesses prior to trial, and, "if the witness is one retained or specially employed to provide expert testimony," this disclosure must be accompanied by a written report. Fed. R. Civ. P. 26(a)(2)(A)–(B). Thus, we agree with Higgins that Dr. Margherita would fall under that section of Rule 26, while Dr. Haacke (Higgins's treating physician) would not. However, Rule 26(a)(2)(C) makes clear that, for all expert witnesses from whom a written report is not required (which would include Dr. Haacke), the litigant who seeks to use that expert's opinion testimony must nonetheless disclose to the other party "the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). Such disclosure must be made at least 90 days before the date set for trial. *Id.* (D)(i). Trial was set in this case for February 10, 2014. So when Koch filed its summary judgment motion on December 19, 2013, the date for filing expert disclosures had passed. For that reason alone, the district

court would have been justified in granting summary judgment for Koch.

Nevertheless, we agree with the district court that, even if Higgins had complied with his Rule 26 expert disclosure obligations, he failed to demonstrate Dr. Haacke's fitness as an expert. Federal Rule of Evidence 702 permits a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to give testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles or methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702 and *Daubert* require the district court to determine whether proposed expert testimony is both relevant and reliable. *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 640 (7th Cir. 2003). "To gauge reliability, the district judge must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." *Id.* In doing so, "[a] district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000). In this case, the district court deemed Dr. Haacke's qualifications and her methodology too questionable to permit her to testify as an expert.

Higgins argues that Dr. Haacke is qualified as a causation expert by sheer virtue of her status as a pul-

monologist, which endows her with "a knowledge base superior to a layperson." But that's not enough. Treating physicians are no different than any other expert for purposes of Rule 702; before proffering expert testimony, they must withstand *Daubert* scrutiny like everyone else. *See O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 n.14 (7th Cir. 1994) ("[W]e do not distinguish the treating physician from other experts when the treating physician is offering expert testimony regarding causation."). Higgins also contends that because Dr. Haacke has twenty years of experience as a board certified pulmonologist, "[i]t goes without saying she understands … reactive airways dysfunction syndrome." Again, Higgins seems to misunderstand the requirements of *Daubert* and Rule 702.

As Judge Tinder articulated when he was a district judge in the Southern District of Indiana, although a doctor may have "experience diagnosing and treating asthma … that does not make him qualified to 'assess its genesis.'" *Cunningham v. Masterwear, Inc.*, 2007 WL 1164832, at *10 (S.D. Ind. Apr. 19, 2007). Higgins, however, put forth no evidence that Dr. Haacke has ever treated another patient for chlorine gas exposure or has any training in toxicology. Nor has Higgins established that Dr. Haacke employed a reliable methodology in forming her causation opinion (even assuming she is qualified to do so). The record demonstrates that Dr. Haacke essentially diagnosed Higgins after listening to his own description of his symptoms and the events at Holiday World—some fourteen months after the fact—and after looking at the results (though not the underlying data) of the pulmonary function study conducted by another doctor the

year before. But the record is silent on whether Dr. Haacke considered other possible causes of Higgins's ailments and, if so, how and why she ruled them out. That is problematic, because Higgins told the district court that Dr. Haacke had assessed the cause of his ailments by employing "differential diagnosis." "Differential diagnosis" actually refers to a method of *diagnosing* an ailment, not determining its cause. *See Myers*, 629 F.3d at 644. "Differential etiology," on the other hand, is a causation-determining methodology. *Id.* But, to be validly conducted, an expert must systematically "rule in" and "rule out" potential causes in arriving at her ultimate conclusion. *Id.* Higgins made no showing that this was done.

"Many times we have emphasized that experts' work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). Here, Higgins simply failed to demonstrate this to be true with respect to Dr. Haacke's causation opinion. Accordingly, we conclude that it was well within the district court's discretion to deem Dr. Haacke unqualified to proffer expert testimony, even setting aside Higgins's non-compliance with Rule 26.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.